Charles T. SCHERM *v.* Linda S. SCHERM

CA 83-310                                        671 S.W.2d 224

Court of Appeals of Arkansas
En Banc
Opinion delivered July 5, 1984

*Norman M. Smith,* for appellant.

*Macom, Moorhead, Green & Henry,* by: *J. W. Green, Jr.,* for appellee.

Tom Glaze, Judge. This appeal arises from a post-

decretal divorce action wherein the appellant/father filed an action seeking custody of the parties' minor children, twin sons, ages four, and another son, age seven. Appellant contends the trial court erred in finding the evidence was not sufficient to warrant a change of custody. We agree and therefore reverse.

First, we recognize the oft-stated rule that this Court will not reverse the chancellor unless it is shown that the lower court decision is clearly contrary to a preponderance of the evidence. Particularly where the credibility of witnesses appearing before the chancellor is concerned, this Court attaches substantial weight to the chancellor's findings on material issues of fact. *Digby* v. *Digby,* 263 Ark. 813, 567 S.W.2d 290 (1978). The primary consideration in awarding the custody of children is the welfare and best interests of the children involved, and other considerations are secondary. *Id.* These same standards are applicable in a change of custody case. *See Bond* v. *Rich,* 256 Ark. 51, 505 S.W.2d 488 (1974); and *Sweat* v. *Sweat,* 9 Ark. App. 326, 659 S.W.2d 516 (1983).

From our review of the entire record, we believe the evidence clearly and decidedly preponderates in favor of a change in custody. In this custody case, there is an unusual amount of consistent testimony, at least on an essential factual issue of importance here. Particularly, appellee concedes a style of life since the parties' divorce that includes entertaining overnight male visitors when her three sons are at home. She admits sexual activity with these men during these visits. In fact, appellee continued such conduct after appellant filed this action and up to one week prior to trial. The evidence in this respect involves appellee's relationships with two men — a married man, Mark Cress, and Jeffrey Bradbury. She first became acquainted with Bradbury sometime in the fall of 1981. Apparently, they saw each other for five to six months. He said that he had stayed at appellee's apartment when the children were there and engaged in sexual relations with her during that period of time. He also related occasions when appellee and the children spent the night with him in Little Rock, Arkansas. After Bradbury and appellee stopped seeing each other, she commenced her affair with Cress during the summer of 1982.

Cress admitted he had spent the night at appellee's home when the children were present, and that he had been in her home every day, including weekends. He conceded that he engaged in sexual activity with her when the children were at home, but he could not give an exact number of occasions. He stated that he did not remember observing appellee preparing the children for church, nor did he remember her taking them. Cress also admitted there were occasions when he and appellee left her home in the morning to take the three boys to their babysitter. He explained these were occasions when he had parked his truck somewhere else or when it was "broken down." Finally, appellee testified that she had engaged in sexual relationships eight or ten times with Mr. Cress at her home when the children were there. The most recent occurrence was a week prior to trial. She stated that "nothing ever happened in front of my children," but she also indicated, "I'm not saying that they . . . that they don't know. I'm just saying that I don't know that they know." Appellee testified that she did not have any plans "to stop that type activity." Appellee did indicate that, if she were so instructed by the court, she would refrain from sexual intercourse with males in the home when the children were present.

Appellant's testimony enlarged on that given by appellee, Bradbury and Cress. He enumerated countless times that he had observed Bradbury and Cress at appellee's home when the children were present. He stated that on one occasion appellee admitted that Bradbury had been staying in her home. Appellant also testified critically about specific matters concerning appellee's failure to properly clothe and care for the boys. He related that until he discussed the matter with appellee, she had failed to properly treat one son's case of scabies. Appellant concluded that he would provide more for the boys in the way of clothes and physical things and that they would be brought up in a more moral atmosphere. If given custody of the children, appellant intends to live in a farmhouse located about a half-mile from his parents' home. His extended family, including his mother and sister-in-law, have volunteered to assist him with the children. The sister-in-law, Mary Scherm, testified that appellant cooks dinner for the boys and that he provides them with a good environment.

At the conclusion of trial, the trial judge concluded that the evidence did not justify a change in custody, but he did order that appellee, while a single person, shall not permit any man romantically involved with her to stay overnight at her residence while the children are there. Obviously, in making such order, the chancellor recognized the precarious situation in which the children have been placed. Aside from any moral argument, appellee has had a relationship with three men since her divorce, and the children have experienced contact with at least two of them. Appellee's amenability to having men in the house on a regular, overnight basis provides the children with an impermanent, unstable situation. Appellee's actions during the two years preceding this action have been neither wholesome nor in the best interests of her children. Appellee clearly voiced no intention to change her promiscuous lifestyle unless ordered to do so by the court. Obviously, such an order places the court and the appellant in a position to continuously monitor appellee's conduct, which is a situation we feel is not demanded by the facts in this case. There is no evidence in the record indicating that since the parties' divorce decree appellant could not provide a good, stable environment for the children. To the contrary, the appellant, with the assistance of his extended family, is in a position to provide not only a good home, but also the physical and moral care these young children require. Of course, all of the evidence in this record is not unfavorable to the appellee. However, considering all circumstances in this case, we believe the greater weight of the evidence compels the conclusion that the children's best interests will be served by placing them in the custody of the appellant.

In reversing and remanding this cause, we direct that the trial court consider the parties' present circumstances in establishing visitation rights for the appellee.

Reversed and remanded.

MAYFIELD, C.J., and COOPER, J., dissent.

MELVIN MAYFIELD, Chief Judge, dissenting. I would affirm the decision of the chancellor. It is interesting to note how cases reversing the chancellor's decision in child

custody cases so often leave out the following quotation so often used when the chancellor is affirmed.

> In cases involving child custody a heavier burden is cast upon the chancellor to utilize to the fullest extent all of his powers of perception in evaluating the witnesses, their testimony and the child's best interest. This court has no such opportunity. We know of no case in which the superior position, ability and opportunity of the chancellor to observe the parties carry as great weight as one involving minor children.

*Calhoun* v. *Calhoun*, 3 Ark. App. 270, 625 S.W.2d 545 (1981).

I dissent.

JAMES R. COOPER, Judge, dissenting. The majority, in a move which recalls puritanical, seventeenth-century Boston, has branded the appellee an unfit mother. What was her sin? I cannot tell. Was it that she, while single, engaged in intercourse with three men in the twenty-eight months following her divorce? Was it that about twenty of these acts occurred in her home while the children were asleep in their separate rooms? Was it because she saw nothing morally wrong with having intercourse with persons with whom she was romantically involved, even though she was not married to them? I cannot tell, she will be unable to tell, and I doubt the chancellor can tell why his decision not to change custody is being reversed.

Today's opinion declines, I think, to follow the rule we ourselves stated in *Calhoun* v. *Calhoun*, 3 Ark. App. 270, 625 S.W.2d 545 (1981):

> . . . In cases involving child custody a heavier burden is cast upon the chancellor to utilize to the fullest extent all of his powers of perception in evaluating the witnesses, their testimony and the child's best interest. This court has no such opportunity. We know of no case in which the superior position, ability and opportunity of the chancellor to observe the parties carry as great weight as one involving minor children. *Wilson* v. *Wilson*, 228 Ark. 789, 310 S.W.2d 500 (1958); *Dennis* v. *Dennis*, 239 Ark. 384, 389 S.W.2d 631 (1965).

It is well settled that the burden is upon the appellant to establish from the record that the chancellor's findings are incorrect, and such findings will not be reversed unless found to be clearly against a preponderance of the evidence. Since the question of preponderance of the evidence turns largely on the credibility of the witnesses, we defer to the superior position of the chancellor in that respect. *Andres v. Andres,* 1 Ark. App. 75, 613 S.W.2d 404 (1981); *Hackworth v. First National Bank of Crossett,* 265 Ark. 668, 580 S.W.2d 465 (1979); Rule 52(a), Arkansas Rules of Civil Procedure.

In *Sweat v. Sweat,* 9 Ark. App. 326, 659 S.W.2d 516 (1983), we stated:

At the conclusion of the trial, the judge admonished the parties that they should not permit their child to be subjected to their use of marijuana in his presence. The chancellor has the right to retain control of this case, and he is in a superior position to ensure that Jason's welfare and best interests are protected. To this effect, *see Phifer v. Phifer,* 198 Ark. 567, 129 S.W.2d 939 (1939). Thus, if the parties fail to heed the chancellor's admonitions, he may choose to take more drastic steps to ensure Jason is provided a proper custodial environment.

As in *Sweat,* the chancellor prohibited the conduct the majority finds objectionable. I fail to see why we do not affirm the chancellor's decision in the case at bar as we did in *Sweat,* thus affirming our faith in the chancellor's ability to put up enforceable orders which protect the best interests of the children.

I think the majority has really decided to punish the appellee for her prior behavior, rather than to decide this case based on the best interests of the children. In so doing, the majority has engaged in some strong and unwarranted condemnation of the appellee. First, it is a gross misstatement to declare that she was amenable "to having men in the house on a regular, overnight basis." As to one of the men with whom the appellee had intercourse, they only dated three weeks. During that time, the children were out of

state for two weeks, and spent the third week with the appellant. Taking the evidence in the light most favorable to the appellant, there were no more than 15 to 20 such occasions over a 28 month period. This seems to me more "occasional" than "regular." Secondly, the majority's statement that such activity "provides the children with an impermanent, unstable situation" flies in the face of common sense, reason, and reality. The majority fails to explain how "contact" with two dates over a 28 month period could cause any problems. Impermanent it may be, as are most dating situations, but to label it as unstable is a large overstatement. Parenthetically, I wonder how realistic it is for anyone to believe that a single parent's dates would not have some contact with the children of a prior marriage in that person's custody.

Finally, I take issue with the majority's characterization of the appellee as "promiscuous." First, the chancellor did not find the appellee to be promiscuous, she has not, contrary to the majority's implication, exposed the children to wanton behavior, and last, there is not a scintilla of evidence in this record which indicates that the children have suffered, or will suffer, any harm whatsoever, particularly in light of the chancellor's order limiting her activities when the children are present, and in light of her assurance that she would obey such an order.

Since the majority opinion is so concerned with morality, despite a statement to the contrary, I feel constrained to point out that the appellant, whom the majority finds to be a better parental influence, testified that he had committed adultery prior to the divorce, and that one reason for the split between the families was that he had had intercourse with the appellee's sister.

I do not purport to know the implications of today's majority decision on the lives of single, custodial parents, but I am sure that the chancellors of this State are quite capable of restricting inappropriate behavior by custodial parents, *Sweat, supra,* and they are also better equipped than are we to decide what kind of behavior is inappropriate in a given case.

I would affirm the chancellor's decision, and therefore, I dissent.